**UNITED STATES of America,
Appellant,**

v.

**Frank Ricardo SCOTT, a/k/a
"Reds," et al.**

**UNITED STATES of America,
Appellant,**

v.

**Bernis Lee THURMON, a/k/a
Benjamin Thornton, et al.**

**Nos. 74–2097, 74–2098.**

United States Court of Appeals,
District of Columbia Circuit.

Argued April 23, 1975.

Decided July 25, 1975.

Rehearing and Rehearing En Banc
Denied Oct. 3, 1975.

See 522 F.2d 1333.

752

Roger M. Adelman, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Stuart M. Gerson, Asst. U. S. Attys., were on the brief for appellant.

Laurence J. Kaiser,* with whom Sherman L. Cohn and Samuel Dash, Washington, D. C. (both appointed by this court), were on the brief for certain appellees.

David E. Schreiber, Washington, D. C., (appointed by this court), was on the brief for appellee Thurmon in No. 74–2098.

John A. Shorter, Jr. and Bernadette Gartrell, Washington, D. C., for appellee Scott.

Before MacKINNON and WILKEY, Circuit Judges, and JAMESON,** Senior United States District Judge for the District of Montana.

Opinion for the court filed by Circuit Judge MacKINNON.

MacKINNON, *Circuit Judge*:

The Government appeals from an order of the District Court suppressing all evidence derived from judicially authorized wiretaps because of a failure to observe the statutory requirement for minimization of the interception of tele-

* Entered an appearance as student counsel pursuant to Rule 20 of the General Rules of this court.

** Sitting by designation pursuant to 28 U.S.C. § 294(d).

phone conversations.[1] The order under review was entered following a remand by this court reversing an earlier order of the District Court which had suppressed the same evidence on identical grounds. *United States v. Scott,* 164 U.S.App.D.C. 125, 504 F.2d 194 (1974). We hold that the District Court failed to correctly apply the standards set forth in our earlier remand and therefore a reversal of the suppression order is again necessary. Because of the extended period of time which has elapsed since the commission of the offenses in question, we have undertaken a review of the intercepted conversations rather than remanding for additional consideration by the trial court. This study convinces us that suppression of the evidence seized through the wiretaps is not appropriate in this case, and the District Court accordingly should bring appellees to trial as soon as possible.

## I

The material facts occurring prior to the initial remand are set forth in this court's opinion in *United States v. Scott, supra.* The decision of that appeal was held in abeyance pending issuance of the opinion in *United States v. James,*[2] wherein this court established standards for assessing compliance with the minimization requirement. *James* identified four factors which determine the degree of minimization required in a given case: (1) scope of the criminal enterprise under investigation; (2) location and operation of the subject telephone; (3) Government expectation of the content of the calls; and (4) judicial supervision by the authorizing judge. 494 F.2d at 1019–21.

After *James* issued, we determined that the District Court had applied an improper standard in reaching its decision to suppress the wiretap evidence in the instant case:

> As *James* and other cases make clear, any minimization determination requires an assessment of the reasonableness of the agents' efforts in light of the purpose of the wiretap and the information available to them at the time of interception. . . .
>
> It appears that the trial court's conclusion that the agents made no attempt to minimize stemmed in large part from its conclusions that they failed to succeed. The court relied heavily upon the fact that some sixty percent of the intercepted conversations appeared to be unrelated to narcotics transactions. . . .
>
> This court's intervening opinion in *James* indicates that an assessment of the reasonableness of agents' attempts to minimize must be judged on a considerably more particularized basis.

504 F.2d at 198. However, since we concluded that the record did not contain all the facts necessary for an assessment of the reasonableness of the agents' conduct, the case was remanded with the following directions:

> The District Court, upon remand, should accept the call analysis and any other evidence that might appear to be of assistance in the resolution of this complicated minimization question. And, after assuring itself of the validity of the evidentiary offerings, it should again assess the reasonableness of the agents' conduct in light of *James* and the comments contained herein.

504 F.2d at 199.

Following our remand, the District Court held four days of evidentiary hearings, received into evidence the Govern-

---

**1.** Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, makes the following provision for minimization of interceptions:

Every order and extension thereof shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, . . .

18 U.S.C. § 2518(5) (1970).

**2.** 161 U.S.App.D.C. 88, 494 F.2d 1007, *cert. denied,* 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974).

ment's "Call Analysis"[3] and the various reports made during the course of the intercept, and heard testimony by the Special Agent in charge of the investigation and the former Assistant U.S. Attorney who had prepared the Call Analysis. Based on this evidence, the court concluded that the Call Analysis is "an after-the-fact non-validated presentation of counsel for the Government"[4] and therefore rejected it in favor of the original characterization by the intercepting agents that 40% of the intercepted calls were narcotic related and 60% were not narcotic related. With respect to the *James* criteria, the court found that the taps were placed on residential rather than "business" telephones, that the interceptions revealed a criminal operation of lesser scope than originally anticipated, and that the authorizing judge was never informed that the agents were making no attempt to minimize.[5] Rather than seeking to identify specific conversations which should not have been intercepted, the court found that the admitted knowing and intentional failure by the monitoring agents to terminate the interception of any conversation rendered their conduct unreasonable and thus suppression of all evidence derived from the wiretaps was necessary.

## II

■ Before analyzing the most recent suppression order, a few general observations about the meaning of the minimization requirement are appropriate. The statute provides that all wiretaps "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception."[6] Since interceptions need only be "minimized," Congress quite clearly contemplated that some irrelevant conversations will inevitably be intercepted. To hold that the monitoring agents must make a determination whether to minimize in the course of each individual conversation would be an open invitation to criminals to escape detection by the simple device of devoting the initial part of each call to non-criminal matters. Thus the only feasible approach to minimization is the gradual development, during the execution of a particular wiretap order, of categories of calls which most likely will not produce

**3.** The "Call Analysis" is a document prepared by the Assistant U.S. Attorney in charge of the case after the District Court had entered its original order suppressing the evidence seized in the wiretaps. It divides the intercepted conversations into seven categories, producing the following results:

| Category | Number of Conversations | Percentage of Total Interceptions |
|---|---|---|
| NS—Communications which in substance relate to the narcotics enterprise | 126 | 32.8 |
| NP—Communications which relate to the narcotics enterprise in part | 7 | 1.8 |
| ME—Communications not concerned with the narcotics enterprise but nonetheless of important evidentiary value | 21 | 5.4 |
| A—Communications so ambiguous that their purpose cannot be determined | 142 | 36.9 |
| R—Communications consisting totally of a recorded message | 27 | 7.0 |
| UNRE—Communications which are unrelated to the narcotics enterprise but which were intercepted with a reasonable expectation of related material. | 55 | 14.3 |
| UN—Communications which are unrelated to the narcotics enterprise and which were intercepted with no reasonable expectation of related material. | 6 | 1.56 |
| Total Interceptions: | 384 | |

**4.** Conclusions of Law, ¶ 3.

**5.** Findings of Fact, ¶¶ 5, 8, and 9, respectively.

**6.** 18 U.S.C. § 2518(5) (1970).

information relevant to the investigation. Once the monitoring agents have sufficient data to conclude that a particular type of conversation is unrelated to the criminal investigation, the minimization requirement obliges them to avoid intercepting future conversations as soon as they can determine that it falls within that category. Until such categories become reasonably apparent, however, interception of all calls will be justified under the wiretap authorization.[7] In addition, even after such a category is developed, it will likely still be necessary to intercept some portion of each call to determine whether it falls into the category being minimized.[8]

Where neither party to the conversation is believed to be a participant in the criminal activity under investigation, the decision to minimize interception of their calls should be easily reached. Where at least one party is a suspected participant in the criminal conduct, the agents will need to amass considerably more data before they can reasonably conclude that further interception will produce no relevant information. It is of course possible that conversations involving suspected conspirators will deal exclusively with topics other than the conspiracy, but it is unlikely that such conversations will be readily subject to minimization.

## III

As we stated in *James*, the standard of minimization is reasonableness which must be determined from the facts of each case:

> The congressional reports accompanying the wiretap statute and decisions interpreting 18 U.S.C. § 2518(5) make it clear that the minimization standard, like the standards traditionally applied to the determination of probable cause, is one of reasonableness which must be ascertained from the facts of a given case. "What is important is that the facts in the application on a case-by-case basis justify the period of time of the surveillance." S.Rep.No.1097, 90th Cong., 2d Sess. 101, U.S.Code Cong. & Admin.News 1968, p. 2190 (1968).

494 F.2d at 1018.

Throughout these proceedings the Government has conceded that its agents did not minimize the interception of any conversations.[9] Thus its position has of

---

**7.** In United States v. Quintana, 508 F.2d 867 (7th Cir. 1975), the court gave the following description of the procedures to be used by the monitoring agents:

> Where the government does not at the outset have reason to believe that any identifiable group of calls will be innocent, then it may be reasonable to monitor all calls for some time. If the agents learn from this initial total interception that there is a pattern of innocent conversations, then they should cease eavesdropping on that group during the remainder of the tap. *Cf.* United States v. Focarile, 340 F.Supp. 1033 (D.Md.). aff'd sub nom. United States v. Giordano, 469 F.2d 522 (4th Cir. 1972), rev'd on other grounds, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).
>
> To state that agents must seek a method of separating innocent from incriminating conversations is not to say that such a pattern will always be identifiable. The problem is that ". . . it is often impossible to determine that a particular telephone conversation would be irrelevant and harmless until it has been terminated.

. . . . .

> It is all well and good to say, after the fact, that certain conversations were irrelevant and should have been terminated. However, the monitoring agents are not gifted with prescience and cannot be expected to know in advance what direction the conversation will take."

United States v. Cox, 462 F.2d 1293, 1301 (8th Cir. 1972), quoting United States v. LaGorga, 336 F.Supp. 190, 196 (W.D.Pa.1971). 508 F.2d at 874.

**8.** It is . . . obvious that no electronic surveillance can be so conducted that innocent conversation can be totally eliminated. Before a determination of innocence can be made there must be some degree of eavesdropping.

United States v. Bynum, 485 F.2d 490, 500 (2d Cir. 1973), vacated on other grounds, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974).

**9.** It was initially determined that calls involving privileged matters, *i.e.* calls between doctor and patient, attorney and client, and priest and penitent, would not be intercepted. Oct. 1974 Tr. 93. The only instance in which an

necessity been that interception of all 384 conversations was reasonable under the facts of this case. The District Court, however, found that the failure to attempt minimization was itself proof that the interceptions were unreasonable:

> The admitted knowing and purposeful failure by the monitoring agents to comply with the minimization order was unreasonable. Such conduct would be unreasonable even if every intercepted call were narcotic related.

Conclusions of Law, ¶ 4.

■ Since the extent of minimization required in a particular case can only be determined during the course of the wiretap,[10] the District Court was clearly in error in asserting that the agents' behavior would be unreasonable under any circumstances. On the contrary, if every call intercepted had been narcotic related, there would have been no occasion to consider whether it was necessary to minimize. Our decision in *James*, which also involved a total surveillance, makes it clear that interception of all conversations may be consistent with minimization in appropriate circumstances.[11]

■ The trial court's error here lies in focusing on the reasonableness of the agents' intent rather than on the reasonableness of the particular interceptions which took place. The subjective intent of the monitoring agents is not a sound basis for evaluating the legality of the seizure. For example, the agents could publicly declare their intent to disobey the minimization provisions of the wiretap order, and yet it is possible that the ultimate interceptions will be found to have been reasonable. On the other hand, even if the agents make their best efforts to comply, the ultimate interceptions may prove to be so unreasonable that suppression is necessary. The presence or absence of a good faith attempt to minimize on the part of the agents is undoubtedly one factor to be considered in assessing whether the minimization requirement has been satisfied, but the decision on the suppression motion must ultimately be based on the reasonableness of the actual interceptions and not on whether the agents subjectively intended to minimize their interceptions.[12]

■ The instant case of course does not present a situation where 100% of the intercepted conversations were narcotic related. Thus it is necessary to determine whether interception of those calls which cannot be classified as narcotic related was nonetheless reasonable under the circumstance of this case. In deciding that they were not, the trial court placed heavy reliance on the original reports to the supervising judge which stated that only 40% of the calls were narcotic related, concluding that this data indicated a substantial number

---

interception was terminated prematurely was one case where the tap was connected to the wrong telephone line. Oct. 1974 Tr. 79.

10. Appellees are correct in asserting that the validity of a search is not to be determined by what is found, as a general principle. United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948); Byars v. United States, 273 U.S. 28, 29, 47 S.Ct. 248, 71 L.Ed. 520 (1927). However, that principle is not relevant to the question of compliance with the minimization requirement, which necessarily turns on what is discovered in the course of the wiretap.

11. *See also* United States v. Quintana, 508 F.2d 867, 873 (7th Cir. 1975); United States v. Manfredi, 488 F.2d 588, 599–600 (2d Cir. 1973), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974); and United States v. Cox, 462 F.2d 1293, 1301 (8th Cir. 1972), *cert.*

*denied*, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974), each upholding interception of all calls over periods of 20 days or longer.

12. *James* states:

> The minimization requirement is satisfied if "on the whole the agents have shown a high regard for the right of privacy and have done all they *reasonably* could to avoid unnecessary intrusion."

494 F.2d at 1018 (emphasis in original). While this language indicates that the attitude of the agents is a relevant factor to be considered, we believe that the decisive factor is the second element—the objective reasonableness of the interceptions. When the monitoring agents fail to manifest "a high regard for the right of privacy," the Government will simply have a heavier burden of showing that the interceptions were reasonable.

of conversations were not properly subject to interception and therefore minimization should have taken place. However, even if 60% of the calls were not related to narcotics transactions, it does not necessarily follow that the interception of these calls was unreasonable.[13] As we indicated in the remand order, the reasonableness of the interceptions must be assessed on a "particularized basis."[14] Before the court can hold that the agents failed to comply with the minimization requirement, it is necessary to show that some conversation was intercepted which clearly would not have been intercepted had reasonable attempts at minimization been made.

It is generally agreed that approximately 40% of the 384 conversations intercepted in this case were narcotic related and thus were properly intercepted. Of the remainder, many were of very short duration and were terminated before their relevance could be determined.[15] Others were extremely ambiguous in nature and possibly involved the use of codes to mask their true purpose. With respect to both types of call, we stated in *Scott*:

Interception of those conversations cannot be considered unreasonable, for the agents could not have determined

whether they were innocent prior to their termination.

504 F.2d at 198. This generally eliminates from consideration the group of calls classified as "ambiguous" in the Government's Call Analysis. Of the remaining 16% of the interceptions, many were one-time conversations which afforded the monitoring agents no opportunity to develop a category of innocent calls whose interception should be minimized.

The only conversations which have been specifically identified during the course of these proceedings as potentially subject to a minimization requirement are the so-called "Geneva-Mother" calls. These are seven calls between Geneva Jenkins, an accused conspirator, and her mother, which occurred on January 26, twice on January 27, January 28, twice on February 4, and February 12.[16] In *Scott*, this court made the following observations with respect to these calls:

While all of the conversations may appear in retrospect to have been innocent, that does not necessarily indicate that each interception was unreasonable. The conduct of the agents must be assessed in light of the information available to them at the time. If the Government's assertion that agents

---

**13.** Consider, for example, United States v. Quintana, 508 F.2d 867 (7th Cir. 1975), where of approximately 2000 calls that were intercepted, only 153 were considered germane enough to be transcribed, and only 47 were used at trial; and United States v. Manfredi, 488 F.2d 588 (2d Cir. 1973), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974), where of over 1000 calls monitored, only 150 were possibly relevant. Each court nonetheless found the interceptions to be reasonable and declined to suppress the evidence seized.

**14.** 504 F.2d at 198.

**15.** Other courts have held that any intercepted conversation lasting less than two minutes should be disregarded in evaluating compliance with the minimization requirement. *See, e. g.*, United States v. Bynum, 485 F.2d 490 (2d Cir. 1973), vacated on other grounds, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974):

The record here discloses that out of 2058 completed phone calls, 1277 of them (more than half) were completed in less than 2

minutes. Since, in a case of such wide-ranging criminal activity as this, it would be too brief a period for an eavesdropper even with experience to identify the caller and characterize the conversation as merely social or possibly tainted, we eliminate these calls from consideration. See United States v. Sisca, 361 F.Supp. 735, at 744 (S.D.N.Y. 1973); United States v. Focarile, 340 F.Supp. 1033, 1050 (D.Md.), aff'd sub nom., United States v. Giordano, 469 F.2d 522 (4th Cir. 1972), cert. granted, 411 U.S. 905, 93 S.Ct. 1530, 36 L.Ed.2d 194 (1973); United States v. LaGorga, 336 F.Supp. 190, 196 (W.D.Pa. 1971). Our concern is with the 781 conversations which lasted 2 or more minutes.

485 F.2d at 500. A large number of the calls intercepted in the instant case would be excluded under this principle, including most of those classified as "ambiguous" and all the recorded messages.

**16.** These appear in the transcript of the tape of the interceptions at pages 24, 41, 44, 55, 132, 136 and 247 respectively.

had reasonable cause to suspect the mother's knowledge of the narcotics conspiracy proves correct, interception of those conversations would not be unreasonable, at least until such time as the initial suspicion should have been dissipated.

504 F.2d at 198–99. Further examination of the record leads us to conclude that the agents did not act unreasonably in intercepting these conversations.

■ The first four calls were intercepted over a period of three days at the outset of the wiretapping and were of moderate length, each covering three or fewer pages of transcript. The second and fourth calls contain statements by Geneva which suggest that her mother may have had knowledge of the "business" operated by "Bernie" Thurmon. See Tape Tr. 42, 55. The fifth and sixth calls took place a week later. In each, the mother states that she has something to tell Geneva which she cannot mention over the telephone because "you ain't suppose[d to] talk *business* on the phone." Tape Tr. 134 (emphasis added). The seventh call is a lengthy conversation in which the only material which could possibly have been related to the narcotics investigation is a statement by the mother that one "Reds," who was in some way involved in the conspiracy, had called and asked for a telephone number. This call is a good example of a seemingly innocent call that might have turned out to incriminate one of the callers as participating in the criminal activity.

While it is apparent in retrospect that none of these conversations were material to the investigation of the narcotics conspiracy, the agents cannot be said to have acted unreasonably at the time they made the interceptions. The repeated references to "business" were sufficient to give them a reasonable belief that future interceptions might produce material evidence, and all such ref-

erences were probative of scienter. If the "Geneva-Mother" conversations had continued to the end of the wiretap, or if there had been a greater number of them, we might well conclude that at some point the agents could no longer have had a reasonable expectation of discovering material evidence and thus should have acted to minimize the interceptions. However, we do not believe that such a point was reached in this case. Because we find no category of conversation which would have required the institution of a minimization procedure by the monitoring agents, and appellees have identified none, it should necessarily follow that the interceptions were not unreasonable. We also apply the *James* criteria to show that the extent of the surveillance was not unreasonable under the particular facts of this case.

1. *Scope of the criminal enterprise*: The trial court made no specific findings with respect to this factor. However, it is clear that appellees were operating a fairly extensive narcotics business. A thorough surveillance of their activities was necessary to disclose the extent of their conspiracy and the identity of the conspirators.[17] In addition, there was testimony that the conspirators used coded language and would occasionally discuss irrelevant matters at the outset of a conversation (Oct. 1974 Tr. 75–78, 354–58). As *James* states:

> Where the members of a conspiracy act with great circumspection, agents may be justified in monitoring a significant part, or perhaps all, of a conversation in order to be sure that it is indeed innocent. A number of reported cases have noted the use of codes within narcotics conspiracies so that superficially innocent conversations are actually highly relevant to the investigation. . . . Another technique often found is the use of guarded language or the deliberate discus-

---

17. See *James*, 494 F.2d at 1019:

Where the criminal enterprise under investigation is a large-scale conspiracy with many participants, it may be necessary for the

government to monitor more conversations with greater intensity than when the investigation is more limited.

sion of irrelevant matters during the early moments of a conversation so that, if the conversations are being monitored, agents, assuming the call to be innocent, will cease the interception.

494 F.2d at 1019. Similar elements in the present case also justified a more intense surveillance.

■■■ 2. *Use of the telephone*: While these telephones were not devoted to "business" purposes to the same extent as the one tapped in *James*, the fact that at least 40% of the calls were related to the narcotics operation suggests that they were not entitled to the same extent of protection as would be afforded in the case of telephones used primarily for lawful purposes. The trial court appears to have relied heavily on the fact that the telephones in this case were located in residences in finding that they were not the type of "business" phones that were involved in *James*. Be that as it may, they were heavily used in the narcotics "business" and the fact that they were located in residences does not immunize them from a court ordered interception. The actual use of the telephones is at least as relevant to the question of the level of surveillance which is reasonable as is their physical location. See *James*, 494 F.2d at 1020. In this case, the high proportion of narcotic related calls justified a more intensive surveillance than would be justified where the traffic in narcotics related calls was much lighter.

3. *Government expectation of the contents of the calls*: On this point, the District Court concluded that the criminal operation discovered was of lesser dimension than originally anticipated. It is conceded that the agents originally expected to uncover an operation dealing in the interstate importation and distribution of narcotics. What they found instead was a local retail outlet serving numerous pushers and users. While what was discovered may be classified as less far reaching geographically, it does not necessarily follow that a less intensive surveillance of the operation would suffice to obtain the evidence needed to support a successful prosecution of the participants. What occurred here was a change in the nature of the operation, not a change in the scope of the activity discovered. Appellees' operation was sufficiently large that it required a relatively extensive surveillance to disclose the features of the conspiracy. As this court stated in *James*, "[i]f the fruits of the tap in its early stages reveal a pattern of criminal conduct unknown to the government at the time of the initiation of the tap, then an expanded policy of interception (within the confines of the court order) may be justified." 494 F.2d at 1020–21.

■■■ 4. *Judicial supervision*: It is true that the supervising judge was never specifically informed that the agents were not minimizing the interception of any conversations. However, the reports made to him every five days by the monitoring agents, which were relied upon by the trial court in reaching its conclusion that the agents were not acting reasonably, disclosed the number of calls that were intercepted and the number of those which were narcotic related.[18] It is thus clear that the judge was aware of the number of irrelevant conversations which were being intercepted and could have modified the wiretap authorization had he believed that any such action was appropriate. This interception order only ran for thirty days, not an overly long period for a wiretap in a narcotics conspiracy case, and we find no deficiency in the judge's supervision which would justify a conclusion that the wiretaps were conducted in an unreasonable manner. However, in issuing orders under 18 U.S.C. § 2518 in the future, courts should include a provision requiring that periodic reports to the supervising judge specifically include statements on at-

---

**18.** *See* Findings of Fact, ¶¶ 6, 7.

tempts to minimize. This will guarantee that the uncertainties in this record are not duplicated in future cases and will further the intent of Congress.

Since we conclude that interception of all 384 conversations was not unreasonable under the circumstances of this case, the evidence seized by the wiretaps is not subject to suppression for failure to comply with the statutory minimization requirement.[19] We therefore reverse the order suppressing all evidence derived from the wiretaps and remand the case to the District Court for further proceedings consistent herewith. In light of the large amount of time which we have noted has already elapsed in this case, we have expedited this opinion ahead of many others that were argued earlier, and the District Court is urged to bring appellees to trial as quickly as possible.

*Judgment accordingly.*

**19.** Because we find that the minimization requirement was not violated, we have no occasion to consider the appropriate remedy in the event of a violation. However, we note that those courts which have considered the issue have concluded that suppression should be limited to the evidence seized which was beyond the scope of the wiretap authorization. *See* United States v. Cox, 462 F.2d 1293, 1301–02 (8th Cir. 1972), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974):

Furthermore, even if the surveillance in this case did reflect a failure to minimize, it would not follow that Congress intended that as a consequence all the evidence obtained should be suppressed. Quite the contrary, 18 U.S.C. § 2517 manifests an intent to utilize *all* the evidence obtained by eavesdropping, and § 2517(5) expressly permits the use in court of evidence obtained by wiretap of a crime other than the crime upon which the court order was premised. Clearly Congress did not intend that evidence directly within the ambit of a lawful order should be suppressed because the officers, while awaiting the incriminating evidence, also gathered extraneous conversations. The nonincriminating evidence could be suppressed pursuant to 18 U.S.C. § 2518(10)(a), but the conversations the warrant contemplated overhearing would be admitted. If appellants, and the unindicted

persons whose conversations were overheard, have any remedy under Title III other than the suppression of conversations outside the warrant's scope, it lies in § 2520 as a civil suit against the investigating officers alleging that they exceeded their authority. *See* United States v. LaGorga, 336 F.Supp. at 196–197.

(Footnote omitted.) *See also* United States v. Sisca, 361 F.Supp. 735, 746–47 (S.D.N.Y.1973), *aff'd* 503 F.2d 1337 (2d Cir. 1974); United States v. Mainello, 345 F.Supp. 863, 874–77 (E.D.N.Y.1972); United States v. King, 335 F.Supp. 523, 543–45 (S.D.Cal.1971), *rev'd on other grounds,* 478 F.2d 494 (9th Cir. 1973), *cert. denied,* 417 U.S. 920, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974); *cf.* United States v. Leta, 332 F.Supp. 1357, 1360 n.4 (M.D.Pa.1971); United States v. Lanza, 349 F.Supp. 929 (M.D. Fla.1972).

In fact, the principal case ordering total suppression as the proper remedy is the District Court's first suppression order in the instant case, United States v. Scott, 331 F.Supp. 233 (D.D.C.1971), which was subsequently vacated by this court. Even if the court was correct in holding that the agents had acted unreasonably in this case, it does not appear that total suppression of the evidence obtained from the wiretap was the proper remedy in light of the above cases.