**UNITED STATES of America**

v.

**James A. PINE, Jr., et al.**

**Crim. No. Y–77–0534.**

United States District Court,
D. Maryland.

March 23, 1978.

Russell J. White, Towson, Md., for defendants.

Herbert Better, Baltimore, Md., for the Government.

## MEMORANDUM AND ORDER

JOSEPH H. YOUNG, District Judge.

The defendant, James A. Pine, seeks to suppress the tape recordings of several telephone conversations with the co-defendant John Paul Daniel. The government has offered these tapes as evidence to support the charge contained in the indictment that the defendants committed mail fraud by attempting to process a false automobile accident claim. The contested conversations were intercepted while Daniel's telephone was under surveillance in March and April, 1977. Pine contends that the interception of the calls, their disclosure to the Federal Grand Jury in October, 1977, and their proposed use at trial violates the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.*

The tap on Daniel's phone, sought by the Baltimore County States Attorney, was authorized by Judge H. Kemp MacDaniel of the Circuit Court of Baltimore County and was executed by the Baltimore County Police Department. Its purpose was to investigate Daniel's suspected involvement in an alleged conspiracy to sell various narcotic drugs including cocaine, PCP, and marijuana. Specifically, the investigators were looking for a local source of money which might finance a large purchase of cocaine from a supplier in Florida for which Daniel was a suspected middle-man.

Coincidentally, in the early morning of April 9, 1977, Daniel was involved in an automobile accident when another vehicle struck his car in the rear. Later that morning, he made a telephone call from the tapped phone to Pine, an attorney, to discuss the accident and the preparation of an injury claim. After intercepting this call and recognizing what he considered to be its criminal implication, the detective in charge advised the supervising Assistant States Attorney of the interception. The States Attorney brought the call to the attention of Judge MacDaniel on the morning of April 11.

Subsequent interceptions of Pine-Daniel conversations took place on April 11 at 11:34 AM and 6:08 PM, on April 12 at 8:27 PM, and on April 14 at 5:59 PM. Judge MacDaniel authorized an extension of the narcotics wiretap on April 27, 1977, but the police made no additional interceptions of conversations with Pine pursuant to it.

Daniel now faces a state indictment for his narcotics involvement as well as the pending federal indictment with Pine.

Title III, 18 U.S.C. § 2517(5), explicitly contemplates the interception and admissibility of communications relating to crimes other than those specified in the order of authorization. That section provides:

(5) When an investigative or law enforcement officer, while engaged in intercepting wire or oral communications in the manner authorized herein, intercepts wire or oral communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.

In the present case the Baltimore County authorities, having intercepted the several Pine-Daniel conversations made the required application to Judge MacDaniel for an order enabling them to disclose the contents of the interceptions. On May 9, 1977, Judge MacDaniel authorized the disclosure which Pine now challenges.

■ The defendant first argues that a state judge cannot enter a § 2517(5) order for the disclosure of tapes in federal proceedings. There is no basis for this contention. The statute provides that if a "judge of competent jurisdiction" makes the appropriate finding, the contents of an "other crime" interception may be used ". . . in any proceeding held under the authority of the United States . . . ." 18 U.S.C. §§ 2517(5), (3). A "judge of competent jurisdiction" includes "a judge of any court of general criminal jurisdiction of a State who is authorized by a statute of that State to enter orders authorizing interceptions of

wire or oral communications . . . ." 18 U.S.C. § 2510(9). Judge MacDaniel of the Baltimore County Circuit Court satisfied this definition. *See United States v. Marion,* 535 F.2d 697, 708 (2d Cir. 1976).

■ Next, the defendant contends that the application to Judge MacDaniel, approved on May 9, was not made "as soon as practicable." Assuming without deciding that the application could have been made several days earlier, the timing of the approval, sought and granted well before the October disclosure to the Federal Grand Jury, supplies no grounds for suppression. *See United States v. Vento,* 533 F.2d 838, 855 (3rd Cir. 1969); *United States v. Denisio,* 360 F.Supp. 715, 720 (D.Md.1973); *See also United States v. Donovan,* 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977). The case of *United States v. Brodson,* 528 F.2d 214 (7th Cir. 1975), cited by the defendant does not suggest a contrary result for there the government never applied for the required judicial approval.

Defendant also complains that the approval for disclosure of the interceptions was improperly granted; that contrary to Judge MacDaniel's finding, the contents were not "otherwise intercepted in accordance with the provisions of [the] chapter."

■ His first challenge to the substance of the disclosure order is based on the fact that an original wiretap order could not have been authorized for the crimes which the tapes allegedly reveal. *State v. Siegal,* 13 Md.App. 444, 462–3, 285 A.2d 671 (1971); *aff'd* 266 Md. 256, 292 A.2d 86 (1972). Section 2517(5), however, does not require that the unrelated "other crime" be a "designated offense", *i. e.,* a crime which can alone be the focus of a wiretap. Sen. Report 1097, 2 U.S.Code Cong. & Admin.News, 90th Cong., 2d Sess., pp. 2112, 2189 (1968). Accordingly, in *United States v. Daly,* 535 F.2d 434, 439–440 (8th Cir. 1976), wiretap evidence of mail fraud, for which the defendants here are indicted, was admitted under § 2517(5).

The substantive requirements of a post interception application under § 2517(5) call for:

. . . a showing that the original order was lawfully obtained, that it was sought in good faith and not as subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order.

Sen. Report 1097, 2 U.S.Code Cong. & Admin.News at 2189. This check is designed to close a potential avenue around the stringent requirements of Title III.

The framers of Title III presumably intended by this requirement to prevent evasion of the several restrictions upon original applications (e. g., showing of probable cause, enumerated serious crime, ineffectiveness of other investigatory techniques as to that offense). Otherwise, the applicant could easily name one crime while in fact he may have anticipated intercepting evidence of a different crime for which the prerequisites could not be satisfied. Such "subterfuge searches", in addition to their dissonance with Title III, would indeed run afoul of the Fourth Amendment.

*United States v. Marion,* 535 F.2d at 700–701.

There is no question that the original order in this case was lawfully obtained, in good faith, and was not a pretext. The wiretap has resulted in several indictments for narcotics involvement and the auto accident did not even occur until after the surveillance had begun. Accordingly, the defendant focuses his attack on the final requirement of an "other crimes" interception. He argues that his communications with Daniel were not intercepted during the course of a lawfully executed order because the state authorities failed to minimize their interceptions of Daniel's telephone calls as required by § 2518(5). This contention also lacks merit.

■ Preliminarily, Pine has limited standing to pursue this objection. "Fourth Amendment rights are personal rights which like some other constitutional rights may not be vicariously asserted." *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 966–67, 22 L.Ed.2d 176 (1969).

The standing provision of Title III, § 2518(10)(a), incorporates this principle. *Id.,* 394 U.S. at 176, n.9, 89 S.Ct. 961. Several courts, citing *Alderman,* have determined that only the subscriber to the telephone has standing to object to improper minimization, since it is his or her privacy, not the various callers', which is protected by minimization. *United States v. Fury,* 554 F.2d 522, 526 (2d Cir. 1977); *United States v. Poeta,* 455 F.2d 117, 122 (2d Cir. 1972); *see also United States v. Ramsey,* 503 F.2d 524 (7th Cir. 1974). Because the interception of some innocent, non-pertinent conversation is inevitable, improper minimization involves repeated, unreasonable interceptions. Therefore, to make the required showing Pine would necessarily have to rely on interceptions of many calls between Daniel and third parties, thus using alleged violations of the rights of others to vindicate his own.

The defendant, citing *United States v. Scott,* 164 U.S.App.D.C. 125, 504 F.2d 194 (1974), argues that standing ought to be accorded a party moving for suppression on the basis of alleged improper minimization. Under § 2518(10)(a), "any aggrieved person" may move to suppress the contents of any intercepted communication on the grounds that

(i) the communication was unlawfully intercepted;

(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval.

Section 2510(11) includes as "an aggrieved person", "a person who was a party to any intercepted . . . communication."

■ At their broadest, these provisions enable a litigant to object to an interception of a communication to which he or she was a party, but only on the grounds that the interception in question was improper. A defendant has no standing to contest the admission of an interception solely on the ground that other conversations to which the movant was not a party were unlawful.

Thus, even accepting a broader view, Pine can challenge the failure to minimize only as to his own communications, and can succeed in suppressing their contents only if they were themselves a product of improper minimization.

■ "Minimization" requires that the police limit as much as practicable their surveillance of calls "not otherwise subject to interception under this chapter." 18 U.S.C. § 2518(5). The investigators have acted reasonably and thus within the rules of minimization if "on the whole [they] have shown a high regard for the right of privacy and have done all they reasonably could to avoid unnecessary intrusion." *United States v. Clerkley,* 556 F.2d 709, 716 (4th Cir. 1977); *United States v. Armocida,* 515 F.2d 29, 42 (3rd Cir. 1975). The Fourth Circuit has adopted certain guidelines which aid in assessing the reasonableness of the surveillance:

> In analyzing a given case, the federal courts have considered three principal factors: (1) the nature and scope of the alleged criminal enterprise; (2) the government's reasonable expectation as to the contents of, and parties to, the conversations; and (3) the degree of judicial supervision while the wiretap order is being executed.

*United States v. Clerkley,* 556 F.2d at 716.

■ Analyzed according to these principles, the interception of the communications to which Pine was a party did not themselves violate the minimization requirements. First, the conversations were intercepted in the course of an investigation of a widespread narcotics conspiracy, an endeavor which justifies giving the police wide latitude. *United States v. Clerkley,* 556 F.2d at 716; *United States v. James,* 161 U.S.App.D.C. 88, 100, 494 F.2d 1007, 1019 (1974). In numerous cases involving investigations of similarly widespread criminal activity, the interception of all communications has been held not violative of § 2518(5). *See, e. g., United States v. Clerkley,* 556 F.2d at 717; *United States v. Chavez,* 533 F.2d 491 (9th Cir. 1976); *United States v. Scott,* 170 U.S.App.D.C. 158, 516 F.2d 751 (1975); *United States v. Quintana,* 508 F.2d 867 (7th Cir. 1975); *United States v. Manfredi,* 488 F.2d 588 (2d Cir. 1973); *United States v. Bynum,* 360 F.Supp. 400 (S.D.N.Y.1973), *aff'd,* 485 F.2d 490 (2d Cir. 1973), *vacated on other grounds,* 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974), *on remand,* 386 F.Supp. 449 (S.D.N. Y.), *aff'd,* 513 F.2d 533 (2d Cir. 1975).

An application of the second factor concerning the agents' reasonable expectations also yields an inference that the police were properly minimizing their surveillance when they overheard the Pine-Daniel calls. Daniel suspected that the police were tapping his phone. He and his alleged narcotics co-conspirators were therefore circumspect, often beginning their conversations with innocent remarks and utilizing code language. These circumstances made reasonable a more thorough monitoring. *United States v. James,* 161 U.S.App.D.C. at 100, 494 F.2d at 1019. Intensive monitoring was also necessary because of the inability of the investigators to establish the identities of Daniel's co-conspirators or any timing or pattern to the narcotics related calls. *See United States v. Clerkley,* 556 F.2d at 717.

Moreover, there was reason to suspect that the Pine-Daniel communications could have some relevance to the narcotics conspiracy. Initially, at least, the detective in charge of the surveillance who monitored the April 9 conversation was not certain that Pine was not a potential financial source for Daniel's impending narcotics transaction. He was aware of Pine's association with a Michael Castiglione, a suspected drug dealer. The opening exchanges of the April 9 conversation revealed that Pine had some prior acquaintance with Daniel. He immediately recognized Daniel's voice, and Daniel's first comment to him was, "I hate to keep bothering you on Saturday, partner." Also early in the conversation, Pine acknowledged a familiarity with Al Mosca who was thought to be dealing in drugs and who, along with Daniel, was a subject of the wiretap.

These matters do not, of course, establish probable cause to believe that Pine was

involved in narcotics conspiracy. They did, however, raise a reasonable suspicion in the detective's mind and justified his continued monitoring. That these suspicions were not subsequently confirmed is irrelevant. The police were charged with the duty of investigating a drug conspiracy in which there was probable cause to believe Daniel played a major role. The monitors therefore had the responsibility to listen to any of his conversations which could produce the evidence sought.

Before the detective could confirm or reject his suspicions, the evidence of the other criminal activity became apparent. Neither the April 9 nor the succeeding communications began with any substantial amount of innocent, irrelevant conversation which should have caused a cessation of the monitoring. Thus, the police were not violating the minimization requirements as they started to listen to what is alleged to be evidence of the mail fraud. In sum, the defendant can only base his minimization argument on the fact that the subject matter of the conversations was not related to the crime of narcotics trafficking, concerning as it did another potential crime.

██ However, the interception of a call relating to a crime different from that originally designated is not by itself violative of the minimization requirement. Significantly, § 2518(5) does not require surveillance be limited to "related" calls but that it "be conducted in such a way as to minimize of communications not otherwise subject to interception under this chapter . . . ." Under § 2517(5) a call which the investigators have properly begun to listen to and which relates to another crime not specified in the original order, is subject to interception. "Other crimes" subject matter is not that which the minimization requirement is designed to insulate from police scrutiny. The case law reflects the understanding that minimization does not *per se* prohibit other crime interceptions by the reference to § 2518(5) as precluding the interception of unrelated, *innocent* conversations. *See, e. g., United States v. Clerkley,* 556 F.2d at 716; *United States v. Armocida,* 515 F.2d at 43.

To hold otherwise on this point would require the police to cease monitoring a call, or a portion of a call obviously relating to crime B, however serious, when wiretapping for crime A. This view was emphatically rejected in *United States v. Johnson,* 176 U.S.App.D.C. 179, n.26, 539 F.2d 181, n.26 (1976).

We recognize, of course, that there is an obligation on the part of judges and investigators to make reasonable efforts to minimize the interception of conversations unrelated to the original purpose of the tap. This obligation is of both statutory, 23 D.C.Code § 547(g) (1973); 18 U.S.C. § 2518(5) (1970), and constitutional dimensions. *Berger v. New York,* 388 U.S. 41, 59, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). However, we reject the contention that it is any part of this obligation to shut off one's recorder in the midst of a properly authorized and conducted interception, when unexpected incriminating evidence presents itself.

The result proposed by the defendant would extinguish the effect of § 2517(5) except in the rare case where the discussion of the "other crime" was so interrelated or intertwined with the principal crime that the police have to listen to the discussion of one to avoid missing reference to the other. There is no basis for such a truncation of § 2517(5) by which Congress clearly intended to allow the interception of evidence of crimes unrelated to that designated in the original order. In preserving § 2517(5) from a different attack, the court in *United States v. Cox,* 449 F.2d 679, 687 (10th Cir. 1971), discussed the unsatisfactory results of eliminating "other crimes" interceptions:

It would be irrational to hold that officers authorized to listen to conversations about drug traffic, upon learning that a bank robbery is to occur, must at once close down the project and not use the information to prevent the robbery since the information is tainted. It would be demoralizing to allow the bank to be robbed while the investigators stood by helpless to prevent the occurrence.

Harder cases can be imagined. For example, in electronic surveillance of organized criminals involved in gambling, information might be intercepted disclosing a conspiracy to commit murder. Surely the officials must be empowered to use this information notwithstanding the lack of specific prior authorization.

██ Even if the minimization requirement were read to require the investigators to cease monitoring whenever they come across a conversation which relates to another crime and which could not turn to a discussion of the relevant crime, the police were justified in continuing their surveillance.

Soon after the police instituted the surveillance of Daniel's telephone, they discovered that it had a new feature, a "call-waiting" system, by which Daniel was able to receive an incoming call, signaled by a low beeping sound, during the course of another telephone conversation. The possibility of an intervening, pertinent call going undetected by the agents was exacerbated by the fact that over 50% of the narcotics related calls intercepted were of a duration of less than one minute. The police therefore feared not only missing the opening remarks (especially the caller's identity) but also the entirety of an intervening conversation.

Pine contends that the switch to the incoming call is accompanied by a slight increase in voltage and could therefore have been picked up electronically, obviating the need for monitoring. The government's expert disputed this, testifying that the slight, instantaneous variation in voltage could not be reliably perceived in the manner the defendant suggests.

Uncontroverted testimony showed that the police were not aware that Daniel's phone had this feature which only recently had become available to Baltimore area subscribers. The division's wiretap technical advisor testified that although he had heard of the capability, he has never faced it in the context of a wiretap. Without in any way suggesting that electronic means cannot and ought not be developed which can detect the changeover to a second call, the Court is satisfied that it would be unreasonable under all the circumstances of this case to require that the police should have had such monitoring equipment available. Thus, to properly execute the original wiretap order and effectively investigate the narcotics conspiracy, it was necessary for the police to listen to each of the Daniel-Pine conversations.

The third and final fact by which the agent's minimization procedures involved in the Pine interceptions are assessed is the degree of judicial supervision. In this regard the police were extremely diligent. Immediately after the interception the detectives and the States Attorney attempted to reach Judge MacDaniel. When they did meet with him they gave him a transcript of the first conversation which he examined in part for its compliance with the minimization requirement, finding that the incriminating conversation was not preceded to any degree by innocent remarks. By visiting the wiretap plant on April 11, Judge MacDaniel was also immediately apprised of the second Daniel-Pine interception. Thereafter, the detectives reported to him every several days, as they had previously.

In sum, the Daniel-Pine conversations would have been intercepted during the most restrictively minimized surveillance. Because of this, the motion to suppress on this ground cannot succeed. Pine's standing makes it unnecessary to assess the minimization procedures generally followed in the interceptions of Daniel's conversations with others. Similarly unnecessary, since the minimization in question was proper, is a determination of the appropriate remedy for a failure to minimize. *See United States v. Cox,* 462 F.2d 1293, 1301–1302 (8th Cir. 1972); *see also United States v. Scott,* 170 U.S.App.D.C. at 167 n.19, 516 F.2d at 760 n.19; *United States v. London,* 424 F.Supp. 556 (D.Md.1976), *aff'd on other grounds,* sub nom.; *United States v. Clerkley,* 4 Cir., 556 F.2d 709; *United States v. Curreri,* 363 F.Supp. 430, 437 (D.Md.1973); *United States v. Askins,* 351 F.Supp. 408 (D.Md.1972).

■ The defendant asserts another ground on which he contends that the contested interceptions were not "incidental to a lawfully executed" original order. He refers to Maryland law, effective at the time the interceptions were made, which makes inadmissible at trial evidence obtained from electronic surveillance relating to crimes other than those designated in the wiretap order. Md.Cts. and Jud.Proc. 10–401(8). He then concludes that a similar standard of admissibility for a state initiated and executed wiretap ought to control in a federal court. However, this Court finds more persuasive the reasoning of *United States v. Curreri*, 388 F.Supp. 607 (D.Md. 1974), in which this same argument was rejected.

■ The defendant concedes, as he must, that federal law (*i. e.*, Title III) governs the question of the admissibility of evidence of a federal crime sought to be introduced in a federal court. *See United States v. Marion*, 535 F.2d at 701. Section 2516(2) of Title III explicitly provides for the use in federal court of evidence obtained by state officials under the authorization of a state judge. In such a case the interceptions are "lawful" if they satisfy the stricter of state or federal procedures for obtention and are admissible in federal court if "lawful". 18 U.S.C. §§ 2517(3), 2518(10)(a), 2515; *United States v. Marion*, 535 F.2d at 700–702; *United States v. Manfredi*, 488 F.2d at 598 n.7; Sen. Report 1097, 2 U.S.Code Cong. & Admin.News, pp. 2112, 2187 (1968). Title III incorporates stricter state law to control the application, authorization and execution of a state order, but does not rely on external standards for admissibility. *United States v. Curreri*, 388 F.Supp. at 614–618.

Although the Maryland wiretapping statute, effective until July 1, 1977, precluded the admission of other crimes interceptions at a state trial, it did not prohibit this type of interception. No civil or criminal penalties sanctioned such interceptions which could lawfully be used for many purposes. Thus, the Daniel-Pine interceptions which conformed with all the Maryland intercep-

tion standards, as well as those of Title III, are admissible in federal court.

The defendant protests that to hold these interceptions admissible would defeat the design of Title III to encourage the states to establish their own more restrictive wiretap requirements and revive the silver platter doctrine rejected in *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). Neither statement is accurate. The suggested policy of Title III is satisfied to the extent that state personnel must observe more restrictive state regulations relating to interception by electronic devices. Similarly, the *Elkins* case in which the Supreme Court ordered suppressed evidence in federal court obtained by state agents in violation of the Fourth Amendment, is clearly inapposite and, thus, does not compel a closer adherence to state law.

The defendant's final argument pertains to the interception of his conversations subsequent to April 9. He maintains that the police anticipated a discovery of evidence relating to a crime other than the distribution of narcotics. He reads § 2517(5) to prohibit "other crimes" interceptions which are not inadvertent in this sense and argues that if the section does not it contravenes the Fourth Amendment. He makes this argument despite the application of § 2517(5) to multiple "other crimes" interceptions in *United States v. Johnson*, 176 U.S.App.D.C. at 182, 539 F.2d at 184, and the unanimity among courts that § 2517(5) is constitutional. *See, e. g., United States v. Cox*, 449 F.2d 679; *United States v. Tortorello*, 480 F.2d 764, 781, n.15 (2d. Cir. 1973).

■ In so arguing, Pine relies on an analogy to the "plain view" exception to the Fourth Amendment warrant requirement for a physical search and seizure. A preliminary problem with his theory is that although the plurality opinion in *Coolidge v. New Hampshire*, 403 U.S. 443, 466, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), suggested it, inadvertence has never been established as a necessary component of the plain view exception. *See Cady v. Dombrowski*, 413

U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). Recognizing that electronic surveillance, because of its insidious nature, may require more stringent safeguards than those for a physical search and seizure (*United States v. Cox,* 449 F.2d at 686), it will be assumed that inadvertence is a requirement · of § 2517(5).

■ Nevertheless, the inadvertence required must be judged from the time the original wiretap authorization is obtained. As the plurality in *Coolidge* indicated, the evil which an inadvertence requirement seeks to avoid, is a "*planned* warrantless seizure" (emphasis added) in which the police know before obtaining the warrant of the existence and location of physical evidence not named in the warrant. *Coolidge v. New Hampshire,* 403 U.S. at 471, n.27, 91 S.Ct. 2022. The Constitution does not insist that the police should have turned off their recorders when the post-April 9 conversations began any more than it prohibits the police from seizing a second bag of heroin in plain view after having found a first in plain view during a warranted search of a house for firearms. As Judge MacDaniel found in granting the disclosure order on May 9, the Baltimore County authorities clearly did not contemplate at the time they applied for the Daniel wiretap that it would uncover evidence of mail fraud.

A refusal to suppress the recordings made in situations similar to the post-April 9 interceptions does not create a general warrant. The police remain limited by the scope of the original warrant. They must, as they were in this case, be monitoring the conversations pursuant to a valid authorization, initiated for some other crime, and be fully in compliance with the requirements of Title III. To hold otherwise would not give additional protection to an individual's privacy interest. In cases such as this, the police will already have a right to intrude upon a person's conversation. A contrary result here would only restrict the law enforcement officer's ability to bring the perpetrator of a crime to justice without a corresponding increase in the protection of anyone's right to privacy.

For the foregoing reasons, it is this 23rd day of March, 1978, by the United States District Court for the District of Maryland, ORDERED:

That the motion of the defendant James A. Pine for a dismissal of the indictment and to suppress the fruits of electronic surveillance be, and the same is, hereby DENIED.