UNITED STATES of America
v.
Robert S. CURRERI et al.

UNITED STATES of America
v.
Patricia BLEAU et al.
(Consolidated cases)
Crim. Nos. 72–0433–B, 72–0434–B.

United States District Court,
D. Maryland.

Dec. 11, 1973.

David E. Holt, Special Atty., U. S. Dept. of Justice, Baltimore, Md., for plaintiff.

Arnold M. Weiner, Baltimore, Md., for defendants.

MEMORANDUM AND ORDER·

BLAIR, District Judge.

Calman Bernstein, a defendant in this prosecution under 18 U.S.C. § 1955 for alleged gambling activities, moved to suppress evidence obtained under a wiretap authorization order entered on April 14, 1972. In addition, he moved to suppress evidence seized at the time of his arrest. Since both motions rested on disputed facts, this court held an evidentiary hearing to resolve the issues presented.

As a result of facts brought to light at the hearing, this court directed that the government make available all records in its possession that contained references to Mr. Bernstein, which the court would then examine *in camera*. After the examination, the court turned over these records to the defendant, with all extraneous material and material which would have disclosed confidential informants excised. Subsequent to his examination of these records, Mr. Bernstein filed a further motion to suppress, this one relating to the conversations intercepted under a wiretap authorization order entered on March 30, 1972, the first in a series of four. The facts now before the court as revealed by the evidence presented at the hearing and by the government's subsequent production of documents, permit final disposition of all three motions. The court will first address the two motions to suppress the wiretap evidence, and will subsequently address the motion to suppress the evidence seized at the time of Mr. Bernstein's arrest.

I.

In a Memorandum Opinion dated July 11, 1973, United States v. Bleau et al., 363 F.Supp. 438 (D.Md.1973), this court dealt with the legal issues applicable to Mr. Bernstein's first motion to suppress. In that opinion, this court noted that Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (hereafter Title III), 18 U.S.C. §

2510 et seq., imposes a qualified requirement that a party whose conversations are to be intercepted be named in the application and order. Section 2518(1)(b)(iv) requires a listing in the wiretap application of "the identity of the person, if known, committing the offense and whose communications are to be intercepted." Section 2518(4)(a) similarly requires that the authorization order list "the identity of the person, if known, whose communications are to be intercepted." These provisions, among others, are designed to insure that the authorizing judge's order—i. e., the warrant—will be adequately particularized according to Fourth Amendment standards as enunciated in Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L. Ed.2d 1040 (1967) and Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L. Ed.2d 576 (1967). See Senate Report No. 1097, 1968 U.S.Code Congressional and Administrative News, 2112, 2189–90. They are also keyed to Title III's notice provisions—an integral part of the statute—in that those named in the order receive an inventory as a matter of right while others whose communications are intercepted in the course of the wiretap receive an inventory only in the discretion of the authorizing judge. 18 U.S.C. § 2518(8)(d).

The listing in the warrant of the name of the owner of the premises to be searched or the things to be seized is not specifically required by the Fourth Amendment, which provides that "no Warrants shall issue, but upon * * * particularly describing the place to be searched, and the person or things to be seized." Hanger v. United States, 398 F.2d 91, 99 (8th Cir. 1968), cert. denied, 393 U.S. 1119, 89 S.Ct. 995, 22 L.Ed.2d 124 (1969). All that need be particularly described for Fourth Amendment compliance is the place to be searched and the thing or person to be seized. See Berger v. New York, 388 U.S. 41, 58–59, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). In regard to telephone communications, it thus appears that the Fourth Amendment permits seizure of particularly described conversations from a particularly described place without naming the speaker in the warrant. United States v. Fiorella, 468 F.2d 688, 691 (2d Cir. 1972).

Congress, however, apparently determined that a higher degree of particularization was desirable and required in Title III that the speaker be identified, but only upon a condition of reasonableness that the speaker be named "if known." On the other hand, if only by implication, if the speaker's identity is not "known", conversations of the type and from the place particularly described can still be seized. Because the Fourth Amendment does not demand an owner's name be in a search warrant otherwise properly descriptive, a failure to name an individual could only be violative of Title III's requirements and not those of the Fourth Amendment. If suppression is proper, it would be the result of a failure to comply with Title III rather than the Fourth Amendment.

Since Title III requires the naming only of those who are "known", it must be determined who fits into the class of knowns, and who, in the unknowns. United States v. Kahn, 471 F. 2d 191 (7th Cir. 1972), cert. granted, 411 U.S. 980, 93 S.Ct. 2275, 36 L.Ed.2d 956 (1973). In its Memorandum Opinion dated July 11, 1973, supra, this court outlined the standards it would require the government to adhere to in naming persons whose conversations were to be intercepted in wiretaps authorized under Title III. Briefly, the court therein held that "[b]efore there is a need for the wiretap order to specifically list a person whose conversations are to be intercepted, the government must, at the time the order is applied for, have probable cause to believe that person is involved in the criminal activity the wiretap seeks to monitor and is a user of the communication facility for that illegal purpose." Memorandum Opinion, supra at 6–7. (emphasis added). This court further stated that it believed "a strong and clear, and not questionable, showing of probable cause existing at the time of

the application is needed to sustain a motion to suppress after the wiretap has concluded, such a showing being tantamount to demonstrating a conscious disregard for the dictates of Title III." *Id.* at 8.

Mr. Bernstein premised his first motion on his belief that his involvement in the gambling operation under investigation was "known" to the government as understood in Title III. If true, he contends, this would trigger the requirement that he be specifically named in the application as one whose conversations were to be intercepted. Since he was not so named, he argues, the government has violated the statutory requirement, and his seized conversations must be suppressed under 18 U.S.C. §§ 2515 and 2518(10)(a). To resolve this issue, the court must examine in detail the information available to the government at the time of application for both wiretap orders.

The records of the Baltimore Office of the F. B. I. reveal that information was developed about Mr. Bernstein beginning in June 1971. At that time, files were opened in the names of "Cal Bernstein" and "Calman Bernstein" and were numbered with the prefix "182", indicating that Mr. Bernstein was suspected of illegal gambling activity (Motion Exhibit 2). Subsequently, on November 13, 1971, a confidential informant, described in these proceedings as Confidential Informant No. 2, advised a special agent of the F. B. I. that Mr. Bernstein was engaged in gambling activity and that a certain third person, identified to the special agent but unnamed here, "is handling the lay-off action of Cal Bernstein." Motion Exhibits 5, 6. One week later, on November 20, 1971, Informant No. 2 identified a person who "personally collects Cal Bernstein's lay-off action from Bernstein at his tavern, located in the Highlandtown section of Baltimore, Maryland." Motion Exhibit 5.

Two months later, on January 18, 1972, the special agent learned from Informant No. 2 that, as of that date,

"Robert Curreri [whose telephones the government sought to tap in its applications of March 30 and April 14] was operating a large numbers gambling business and giving his lay-off to Cal Bernstein who, in turn, was laying off to" another person whom the informant identified. Motion Exhibits 3, 5. In the lower left corner of the report of this interview there are typed together, for filing purposes, the names of Cal Bernstein and Robert Curreri. Motion Exhibit 3. In the lower right corner is the signature of another special agent who would eventually serve as affiant in the government's application for the wiretap order. Motion Exhibit 3. This special agent, who was in charge of this case, testified at the evidentiary hearing and acknowledged that Informant No. 2 was known to be reliable. He also said that he had been told by another informant that a man named "Cal" was active in the Baltimore gambling community. As a consequence of this latter information, the special agent, on February 28, 1972, visited the head of the Baltimore City Police Department Vice Squad, who identified "Cal" as Calman Bernstein and also informed the special agent that Mr. Bernstein was reputed to be engaged in gambling and that he believed that he was so engaged. *See also* Motion Exhibit 5.

On March 1, 1972, this special agent prepared an affidavit for electronic interception. Motion Exhibit 5. The affidavit, which identified Mr. Bernstein and Mr. Curreri by name, stated that there was probable cause to believe that they were then engaged together in an illegal gambling business; that the telephones at Ocean Pride Seafood, among others, were being used to carry out the illegal business; and that evidence against them might be obtained through interception of wire communications. Motion Exhibit 5 at 1, 2. On March 3, 1972, the proposed affidavit was submitted to the F. B. I. headquarters in Washington, D. C., for review, in accordance with established procedure. Four days later, on March 7th, the

Washington office advised its Baltimore office that, "[a] review of your affidavit indicates that the subjects are engaged in a gambling operation which appears to warrant Title III electronic surveillance coverage." Motion Exhibit 1. Headquarters requested, however, that, "[t]o corroborate information provided by informants, you should attempt to develop additional current information regarding . . . Calman Bernstein." *Id.* On March 8, 1972, the day after this message had been received, a special agent interviewed another confidential informant for the purpose of obtaining current information as to Mr. Curreri and Mr. Bernstein. This informant related that Mr. Curreri was then "active in the numbers field" and that he was "laying off to Cal Bernstein." Motion Exhibit 4.

Notwithstanding this latest information, which also tied Mr. Bernstein to the Curreri operation, the government chose not to name him in its application for the March 30 order. In the course of the subsequently authorized wiretap, the government intercepted two calls that related to Mr. Bernstein. In the first, on April 11, 1972, two men identified as "Bob" and "Cal" engaged in an extended discussion of the mechanics of the gambling operation. Motion Exhibit 7. The second, on April 12, contained a passing reference to Mr. Bernstein. Motion Exhibit 8.

In his original motion to suppress, Mr. Bernstein argued that the first gambling-related conversation sufficiently involved Mr. Bernstein in the gambling operation to move him from the category of "others unknown" to that of "known" within the meaning of Title III, requiring that he be specifically named in the application as one whose conversations would be intercepted. In his second motion, he contends that, based on the facts as brought forth by the evidentiary hearing, the government, even prior to its interception of the first

gambling-related call, had sufficient probable cause to know of his involvement in the gambling operation, thereby triggering the Title III requirement that he be specifically named in the application as one whose conversations were to be intercepted.

The court will first address the later motion—which relates to suppression of the conversations intercepted in the course of the March 30, 1972 tap. In this motion, defendant seems to assume that a strong showing of a person's involvement in a gambling operation leads *a fortiori* to the conclusion that such person will use the telephones of his co-conspirators in furtherance of that illegal activity. The Fourth Circuit has held that one who accepts "lay offs" [1] from another can be an integral part of the gambling system, since the laying off of bets is necessary "to achieve the goal of balanced books essential to a bookmaking system without risk of loss." United States v. Bobo, 477 F.2d 974, 990 (1973). Thus, this court agrees with defendant that the evidence available to the government at the time of the application amounted to probable cause to believe that Mr. Bernstein was involved in the illegal activity the wiretap sought to monitor. However, it is unable to agree that such showing of involvement, without more, establishes probable cause to believe that he will use the telephones of all others whose involvement in the scheme is also established. In so doing, defendant appears to slight the second prong of the two-pronged test for the need to specifically list a person in the wiretap order —probable cause to believe that he is a user of the facility. Both prongs must be satisfied by "a strong and clear, and not questionable, showing of probable cause." To argue that probable cause can be found from such facts alone is to equate probable cause with permissible inference and, in this court's view, does

---

1. "When a betting person has more money bet on a participant than he wishes, he transfers all or a part of the bet to someone else. This is called laying off." United States v. Bobo, 477 F.2d 974 (1973) at 990 n.9.

not satisfy the higher standard which Congress required.

To demonstrate the type of independent verification this court believes would supply the necessary probable cause, this court points to informant testimony as regards Mr. Curreri and "an individual known as Bernice." One informant of high reliability stated specifically that he knew that "an individual known as Bernice" would be "handling the telephone at Curreri's numbers office" for the illegal gambling operation then under investigation, Motion Exhibit 5 at 7, and she was listed in the wiretap order of March 30, 1972 as one whose conversations were to be intercepted. Similarly, several informants asserted that they knew from personal observation that Mr. Curreri was a user of the Ocean Pride telephones for that illegal purpose, Motion Exhibit 5, and he too was listed in the order.

In examining the record, the court finds no independent verification of the probability that Mr. Bernstein was a user of the telephones the government sought to monitor, save for the bald assertions to that effect contained in the government's March 3 affidavit that had been rejected by F. B. I. headquarters. As a result, this court finds that as of March 30, 1972, Calman Bernstein was not "known" to the government in a manner that required his listing under the provisions of Title III in the application and order for the March 30, 1972 wiretap, and his motion to suppress conversations intercepted in the course of that wiretap is hereby denied.

Next, the court will address Mr. Bernstein's first motion to suppress—which related to suppression of the conversations intercepted in the course of the wiretap authorized on April 14, 1972. In the course of the discussion above, the court determined that information available to the government established "strong and clear" probable cause as to Mr. Bernstein's involvement in the gambling scheme under investigation. The question this court must now resolve is whether or not the information intercepted as a result of the March 30, 1972 wiretap order moved Mr. Bernstein from the category of "others unknown" to that of one "known", requiring his specific listing in the April 14 wiretap application and order—in other words, whether or not the second prong of the two-pronged test was satisfied. To do so, the intercepted conversations would have to establish either actual use, or a strong probability of use, of the monitored telephones by Mr. Bernstein for the illegal activity the government was investigating.

As mentioned above, Mr. Bernstein in fact did use the monitored telephone on March 11, 1972 for that illegal purpose. Motion Exhibit 7. This conversation was noted in the F. B. I. monitoring logs, and the monitoring officers indicated at the hearing that on the day of the interception they discussed the conversation with the special agent who was in charge of the investigation and who, four days later, was the affiant in the April 14 application. Even though the caller was identified only as "Cal", this court is constrained to note that the information available to the government at the time of the intercept could lead to only one conclusion—that "Cal" was indeed Calman Bernstein. In fact, the testimony of the three special agents at the hearing lead the court to conclude that they had immediately assumed that "Cal" was Calman Bernstein. One agent testified that he was familiar with Calman Bernstein and had investigated him "for at least several months", and he understood immediately the significance of the call which had come from "Cal". Another agent stated that the three agents had "speculated" that they had intercepted a gambling conversation between Mr. Bernstein and Mr. Curreri.

On the following day, April 12, 1972, another call involving "Cal" was intercepted. Motion Exhibit 8. The caller asked "Bob" for "Cal's telephone number." "Bob" replied, "Yea, I have it but I'm not supposed to give it out," and then suggested "You call him at the

bar; the number is 732–9722." One of the special agents testified that he knew at the time of the intercept that Mr. Bernstein owned a bar, and knew its name and location. This call, too, was discussed by the special agents on the day of the intercept.

At this point, it might reasonably be asserted that the sheer mechanics of the tap would not enable the government to process the information quickly enough to utilize it in the application of April 14. In fact, the last conversation used in the application to justify extension of the tap was intercepted on April 10. Arguably, if it takes a day or two to transcribe the tape recordings, plus a day or two to prepare the application and the affidavits, plus a day or two for the authorizing judge to review the file, it would be unreasonable to require the government to act on material not physically available at the time of application. For this reason, the government could argue quite persuasively that the above-mentioned conversations intercepted on April 11 and April 12 in the course of the first wiretap, Motion Exhibits 7 and 8, were not available at the time of the second application for extension.

■■■ While this court will assume without deciding that the latter conversation could not reasonably be considered in the application of April 14, it does not so find in the case of the conversation of April 11. This conversation of April 11 between Mr. Curreri and Mr. Bernstein supplied sufficient— i. e., "strong and clear"—probable cause for the government to believe that Mr. Bernstein would use the tapped telephones, satisfying the hitherto unsatisfied second prong of the naming re-

quirement. Absolute assurance on the part of the government that the caller "Cal" was in fact Calman Bernstein is not required to show probable cause. After examining the record, the court finds that probable cause existed to believe that the caller was Calman Bernstein.

As a result, Mr. Bernstein was "known" within the meaning of Title III's naming requirement at the time of the April 14, 1972 application and · his motion to suppress the conversations intercepted in the course of the tap authorized by the order of that date is hereby granted.[2]

## II.

The defendant has also moved to suppress evidence seized during the search of his person at the time of his arrest on August 30, 1972. On that date, the arresting officers, special agents of the F.B.I., acting pursuant to a valid arrest warrant, stopped Mr. Bernstein as he departed a Baltimore restaurant in mid-morning and informed him that he was under arrest. Thereupon, as the agents recount it, they had the defendant lean against a parked automobile as one of the agents conducted a patdown for weapons. In the course of the patdown, the agent felt a firm lump in the right front pocket of the defendant, reached into the pocket, and pulled out a one-inch thick wad of bills and two three-by-five cards. Written on these cards were lists of names and figures.

Defendant seeks to suppress the introduction into evidence of these cards, alleging in his motion a violation of his Fifth Amendment privilege against self-incrimination and a violation of the

---

2. Viewed from other perspectives, the result which the court reaches here may appear anomalous. Had the government agents been less diligent in their investigation and therefore had less knowledge about the defendant he may not have been "known" to them. The interceptions then may have been' serendipitously beneficial to the government. Or had the government sought and obtained originally an order permitting inter-

ception for 30 days instead of 15 days as it did—the monitored conversations now suppressed may have passed muster. From these considerations, it may appear that the government is penalized for diligence, prudence and restraint. The court's resolution of the issue, however, must come from an application of the law to the facts presented, anomalous consequences aside.

Fourth Amendment proscription against unreasonable searches.

■■ This court will deal with the Fifth Amendment consideration first, since, in cases that assert both Fifth and Fourth Amendment violations, the Fifth Amendment issue should be resolved initially. Schmerber v. California, 384 U.S. 757, 767–768, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); Hill v. Philpott, 445 F.2d 144, 148 (7th Cir. 1971).

Defendant Bernstein, presumably on the grounds that the cards are testimonial or communicative in nature—the equivalent of private books and records at issue in Hill v. Philpott,[3] 445 F.2d 144 (7th Cir. 1971), cert. denied, 404 U.S. 991, 92 S.Ct. 533, 30 L.Ed.2d 5—claims that their introduction into evidence at trial would violate his Fifth Amendment privilege against self-incrimination. On the facts presented by this case, this court finds more persuasive the more recent Sixth Circuit case, United States v. Blank, 459 F.2d 383 (1972), cert. denied, 409 U.S. 887, 93 S.Ct. 111, 34 L.Ed.2d 143 (1972). In *Blank,* the evidence sought to be suppressed represented work sheets, allegedly in defendant's handwriting, of a sports and horse book betting business that were seized under an admittedly valid search warrant. The District Court had suppressed the evidence on Fifth Amendment grounds, and the Court of Appeals vacated the suppression order. The court based its decision on two primary facts, both applicable to the case at bar:

1) The subjects of the seizure are not personal communications at all· but rather business accounts rendered ex-

traordinary only by the fact that the business is itself illegal.

2) These are not privately recorded and privately held thoughts or descriptions of events, as in the case of a closely held diary, but rather business records of which other persons must have knowledge. [footnote omitted].

\* \* \* \* \* \*

In summary, we feel that appellant was not "compelled" to produce these papers in violation of the Fifth Amendment; that the papers are not communicative in nature; that the papers are business records rather than personal and private writings; and that they are on their face instrumentalities of the crime with which appellant is charged. So viewed, they are subject to seizure under Fourth Amendment search warrant procedures and having been so seized, should not have been suppressed. United States v. Blank, 459 F.2d 383 at 386–387.

■■ In Mr. Bernstein's case, the two cards were seized in compliance with Fourth Amendment procedures as will be shown, *infra;* the seizures in no way involved compulsion within the meaning of the Fifth Amendment,[4] and the cards were the business records and instrumentalities of the illegal activity. For these reasons, this court denies defendant's motion, based on Fifth Amendment grounds, to suppress the two cards seized by the government.

■■ The court now turns to the defendant's claim that the search itself offended the constitutional requirements of the Fourth Amendment. Searches incident to a lawful arrest, with or with-

---

3. Hill v. Philpott held that the defendant's Fifth Amendment privilege against self-incrimination had been violated by seizure of his private books and records, despite the fact that the materials had been seized pursuant to a search warrant valid under the Fourth Amendment.

4. *See* United States v. Blank, 459 F.2d 383 (6 Cir.) at 385. The seizure incident to the arrest involved no compulsion to produce demanded information as would, for example, a subpoena. In other words, there was no demand for affirmative action. *See* Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1885); Schmerber v. California, 384 U.S. 757, at 763–764, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

out a warrant, do not offend Fourth Amendment safeguards provided they are reasonable searches. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). As the Supreme Court said in *Chimel:*

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. * * * In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.

395 U.S. at 762–763, 89 S.Ct. at 2040.

■ The search incident to arrest in the case at bar complies with the standards enumerated in *Chimel.* The agent who searched the defendant testified that the patdown and search were protective—to determine if Mr. Bernstein, a former police officer, carried a weapon. This court is persuaded and accepts as a fact that the agent had a reasonable apprehension that the "hard lump" he felt in Mr. Bernstein's pocket might be a weapon. This provided sufficient cause for the agent to reach into Mr. Bernstein's pocket to remove the suspicious object. In so doing, the incriminating evidence was inadvertently removed in the process. On this basis alone, the court would deny Mr. Bernstein's motion to suppress.

■ It must be noted, of course, that *Chimel* permits a much more extensive warrantless search of an arrestee than the simple search for weapons that the agents claimed to be conducting herein. A search for evidence incident to arrest would also be permitted as long as it was reasonable. The defendant,

however, claims that a search incident to a lawful arrest can proceed beyond a protective patdown for weapons only if the arresting officer has probable cause to believe that destructible evidence of the crime will be found on the person.[5] Defendant cites several cases to support his theory, but none are on point. Each involved a search of the person following a warrantless arrest for a traffic offense, and it is clear to this court that a search of an offender's person for evidence of a traffic offense is, without more, manifestly unreasonable. The court is persuaded that even if the sole purpose of the search at the time of arrest had been for evidence, it would nonetheless be a lawful search in this instance.

For the above-stated reasons, this court finds that defendant's motion to suppress the evidence on Fourth Amendment grounds must also be denied.

---

5. It is not entirely settled that the search must be for evidence reasonably related to the crime for which the warrant issued. *See, e. g.,* United States v. Simpson, 453 F. 2d 1028, 1030 (1972), cert. denied, 408 U.S. 925, 92 S.Ct. 2504, 33 L.Ed.2d 337 (1972), where the Tenth Circuit upheld the search of the arrestee's wallet and the seizure of

evidence therein upon his lawful arrest on a dynamite charge. Nonetheless, the court is convinced that the search in this case, if it had been for evidence, would have borne a reasonable relationship to the crime for which the defendant was arrested. *See* United States v. Humphrey, 409 F.2d 1055 (10th Cir. 1969).