**UNITED STATES of America**

v.

**Robert Reubin LONDON et al.**

**Crim. No. B–75–099.**

United States District Court,
D. Maryland.

Feb. 26, 1976.

Jervis S. Finney, U. S. Atty., James E. Anderson and Marsha A. Ostrer, Asst. U. S. Attys., Baltimore, Md., for plaintiff.

Harold I. Glaser, Baltimore, Md., for defendants Robert Reubin London, Julius Cottman and Rufus H. Jones.

Michael Kaminkow, Baltimore, Md., for defendant Maceo Clerkly.

## MEMORANDUM AND ORDER

BLAIR, District Judge.

■ After having been convicted by a jury of conducting an illegal gambling business as proscribed by 18 U.S.C. § 1955 (1976 Supp.), Robert Reubin London a/k/a Fifi London, Julius Cottman, and Rufus Jones have moved for a judgment of acquittal or in the alternative for a new trial pursuant to Federal Rule of Criminal Procedure 33.[1] Maceo Clerkly, who was found guilty by the court on the same charges after a trial on stipulated facts, has moved for a new trial.[2]

---

1. Originally fourteen defendants were indicted for participating in an illegal numbers business. Of these, eight (Richard Genco, Randolph Fortune, John Shade, Warren Womack, Maceo Clerkly, Robert and Susan Himes, and Michael DiLorenzo) were tried by the court on stipulated facts, six of whom were found guilty with a finding of guilt for the remaining two deferred until consideration of a presentence report. One defendant (Ambrose Robinson) died pending trial and another defendant (Leon Englehardt) went to trial on stipulated facts for a substituted indictment (Crim. No. B–75–0838), with a finding of guilt presently being deferred pending consideration of a presentence report. Lastly, charges against one defendant (Major Payne, Jr.) were dropped with the expectation

that charges would be pressed against the defendant's wife. As mentioned, only defendants London, Cottman and Jones went to trial where they were found guilty by a jury after an extensive trial lasting several weeks.

2. Since it was filed over two months after a finding of guilty by the court, defendant Clerkly's motion for new trial arguably should not be considered by this court. See F.R.Cr.P. 33; *United States v. Bryant,* 430 F.2d 237, 240 (8th Cir. 1970). Nonetheless, because Clerkly's motion does not raise any issues not advanced timely by the other defendants and because the motion rests primarily on highly material facts adduced only at the jury trial in this case, the court will consider the motion. See F.R.Cr.P.

Defendants present several grounds in support of their motions. Specifically, they contend that:

1. The court improperly admitted into evidence tape recordings of conversations overheard at 1202 North Charles Street, Baltimore, Maryland, defendant London's place of business, since such recordings were obtained in violation of Title III of the Omnibus Crime Control and Safe Streets Act (18 U.S.C. §§ 2510 *et seq.* (1970 & 1976 Supp.));

2. The court improperly did not allow defendants to introduce evidence pertaining to the FBI's alleged harassment of the defendants;

3. The court improperly instructed the jury with respect to "layoffs" and with respect to the legality of the wiretaps;

4. The applications for interception of wire and oral communications were legally insufficient; and

5. The court lacked jurisdiction since the two Assistant United States Attorneys who tried the case did not live within the District of Maryland, in contravention of Title 28, U.S.C. § 545(a) (1968).

Each of these grounds will be considered in turn.

## I

The government's evidence produced at trial and proffered at the stipulated fact trials in this case consisted in large part of tape recordings of conversations intercepted at 1202 North Charles Street, Baltimore, Maryland, defendant London's place of business. These conversations were intercepted by means of an eavesdropping device pursuant to court Order. Misc. No. 936 (Aug. 13, 1974). The Order authorized interception for a maximum of twenty days with progress reports to be supplied to the court every five days. The Order included a directive that the interception of the com-

munications be conducted so as to minimize the interception of conversations not subject to interception under Chapter 119 of Title 18. For a variety of reasons, defendants argue that the tapes obtained through this Order should not have been admitted into evidence.

Testimony at trial in this case indicated that in installing the electronic device at 1202 North Charles Street, FBI agents manipulated the door lock with "burglar type" tools, placed two microphones in separate locations, and then made a key to fit the outside office door's lock. Defendants argue that in violation of their right to privacy this entrance was unauthorized either by defendant London or by the court Order. This allegedly illegal entrance, defendants contend, so tainted the taped conversations obtained through the authorized interception as to render them a fruit of the poisonous tree and inadmissible as evidence. While conceding the installation to have been clandestine, the government argues that requiring defendant London's permission prior to installation would have defeated the investigatory purpose of the electronic eavesdropping. The government maintains that the clandestine entry into Mr. London's office was lawful in execution of the intercept Order.

 Clearly, FBI agents were not obliged to obtain the consent of defendant London prior to installation of the electronic intercept. After articulating the myriad dangers posed by organized crime, the legislative history of the Omnibus Crime Control and Safe Streets Act, Title III of which provides for electronic interception, states:

> Organized criminals must hold meetings to lay plans. Where the geographical area over which they operate is large, they must use telephones. Wiretapping and electronic surveillance techniques can intercept these wire and oral communications. This is not, however, the whole situation. More than the securing of an evidentiary substitute for live testimony,

33; *Giglio v. United States,* 405 U.S. 150, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. McCoy,* 478 F.2d 846, 847 (4th Cir.

1973); *Wright v. United States,* 353 F.2d 362, 365 (9th Cir. 1965).

which is not subject to being eliminated or tampered with by fear or favor, is necessary. To realize the potential possible from the use of criminal sanctions, it will be necessary to commit to the system more than legal tools. Time, talent, and personnel are required. Nevertheless, no amount of time, talent, or personnel—without the necessary legal tools—will work, and authorized wiretapping and electronic surveillance techniques by law enforcement officials are indispensable legal tools.

1968 *Code Cong. & Ad. News* 2112, 2161 (90th Cong., 2d Sess.). *See also id.* at 253. Implicit in this Congressional recognition of the usefulness of electronic interception is the common sense realization that such interception, if it is to be effective, must be covert. *Cf. Katz v. United States,* 389 U.S. 347, 355 n.16, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *United States v. Buckhanon,* 374 F.Supp. 611, 613–15 (D.Minn.1973).

 The question remains then whether the installation was accomplished lawfully under the court Order authorizing the interceptions. After determining that probable cause existed that the premises at 1202 North Charles Street were being used in conjunction with an illegal gambling business violative of federal law, Judge Young ordered that the FBI was authorized under Title III to "[i]ntercept oral communications of Robert 'Fifi' London . . . occurring in the office space located in the basement of 1202 North Charles Street . . . ." Misc. No. 936 (Aug. 13, 1974). Necessarily concomitant to and envisioned in the court order, this court believes, was the covert installation of the recording devices. At the outset, it should be noted that there was no general search or seizure at the time of the installation, rather the FBI agents simply entered the premises, hid the

microphones and left. In so entering, the agents' sole purpose was effectuation of the court order. Realistically, this intrusion was no greater than the interceptions themselves, which were judicially authorized after a finding of probable cause. Also, even if the FBI's entry was unauthorized, which this court does not believe or hold, the taped conversations would still be admissible since they stemmed from an authorized electronic surveillance, and hence, could not be said to be fruits of the poisonous tree. *See Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).[3]

Defendants more vigorously contend that the FBI failed to properly minimize its interception of the conversations at 1202 North Charles Street. Judge Young's Order provided, pursuant to 18 U.S.C. § 2518(5) (1970):

. . . this authorization to intercept oral communications shall be executed as soon as practicable after signing of this order and shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under Chapter 119 of Title 18, United States Code, and must terminate upon attainment of the authorized objective, or in any event, at the end of twenty (20) days from the date of the installation of the listening device, whichever is earlier.

Misc. No. 936.

At trial, the FBI agents' testimony established that, with the exception of one privileged conversation between defendant London and his lawyer, whenever defendants London or Genco or Albert Isella were present at 1202 North Charles Street, all conversations were monitored by FBI agents. Only those conversations which the agents believed pertinent to gambling were recorded.[4] The defendants assert that the

---

**3.** Additionally, defendants did not timely question the admissibility of the tape recordings based on the FBI's covert installation activities either before or at trial. The nature of these installation activities clearly were within defendants' knowledge prior to trial. *See* F.R. Cr.P. 12, 41(f); McCormick, *Evidence,* § 180 (2d ed. 1972).

**4.** At the post-trial motion hearing, the Special FBI Agent in charge of the investigation testified, and the court finds the testimony to be credible, that the 1202 N. Charles St. office was monitored for a total of 117 hours and 39 minutes, of which 23 hours and 24 minutes were recorded as conversations apparently relating to the illegal gambling activity under investiga-

court order authorizing the interception, while generally requiring minimization, lacked specific directives and that the FBI agents therefore intercepted a substantial number of personal and business conversations irrelevant to federal criminal charges in contravention of Title III. *See* 18 U.S.C. § 2518(5) (1970). On this basis, defendants seek suppression of the tapes, judgment of acquittal or a new trial where the tapes would not be admitted into evidence.[5]

In enacting Title III of the Omnibus Crime Control and Safe Streets Act, Congress clearly was concerned that improper interception of communications protected by the right to privacy should be curtailed. *See* 1968 *Code Cong. & Ad. News* 2112, 2154–56 (90th Cong., 2d Sess.). To protect this right of privacy, Congress enacted 18 U.S.C. § 2518(5) (1970) which provides in relevant part:

Every order . . . shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . .

Additionally, Congress enacted a statutory exclusionary rule to insure that improperly intercepted communications should not be received into evidence. Title 18, U.S.C., § 2515 (1970) provides:

Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

These minimization strictures thus require that

. . . the intercept procedure shall be conducted in such a way as to reduce to the smallest possible number the interception of communications which do not provide evidence relating to the commission of any of the crimes set forth in §§ 2516(1)(a)–2516(1)(f).

*United States v. Focarile,* 340 F.Supp. 1033, 1046 (D.Md.), *aff'd sub nom. United States v. Giordano,* 469 F.2d 522 (4th Cir. 1972), *aff'd,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).

▮▮ Title III does not require that there be *no* interception of innocent conversations, only that the interception procedure be designed to minimize such interception. In determining whether there has been sufficient minimization, courts have analyzed the issue on a case by case basis, guided by a standard of reasonableness. *See United States v. Doolittle,* 507 F.2d 1368, 1372 (5th Cir.), *aff'd per curiam,* 518 F.2d 500 (5th Cir. 1975) (en banc), *petition for cert. dismissed,* 423 U.S. 1008, 96 S.Ct. 439, 46 L.Ed.2d 380 (1975); *United States v. Armocida,* 515 F.2d 29, 42 (3d Cir. 1975); *United States v. Quintana,* 508 F.2d 867, 874 (7th Cir. 1975); *United States v. Scott,* 164 U.S. App.D.C. 125, 504 F.2d 194, 198 (1974); *United States v. James,* 161 U.S.App.D.C. 88, 494 F.2d 1007, 1018, *cert. denied,* 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974); *United States v. Manfredi,* 488 F.2d 588, 599 (2d Cir. 1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974); *United States v. Cox,* 462 F.2d 1293, 1300 (8th Cir. 1972), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974); *United States v. Focarile, supra* at 1047; 1968 *Code Cong. & Ad. News* 2112, 2192 (90th Cong., 2d Sess.). Stated otherwise, minimization may be said to have been accomplished where the intercepting agents demonstrate a high regard for the right to privacy and where they avoid unnecessary intrusion into innocent communication. *See United States v. Tortorello,* 480 F.2d 764, 784 (2d

---

tion. Thus, approximately 20% of the time which was monitored is reflected in recording.

**5.** The court construes defendants' motions to suppress the tapes as timely even though they

are made post-trial since the grounds were largely unknown prior to the trial. *See* 18 U.S.C. § 2518(10)(a) (1970).

Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973). Courts have recognized that due to the nature of electronic eavesdropping, some interception of innocent conversation is usually unavoidable. *United States v. Doolittle, supra* at 1372; *United States v. Scott,* 170 U.S.App.D.C. 158, 516 F.2d 751, 754 (1975); *United States v. Armocida,* 515 F.2d 49, 53 (3d Cir. 1975); *United States v. Manfredi, supra* at 599; *United States v. Falcone,* 364 F.Supp. 877, 886 (D.N.J. 1973), *aff'd summarily,* 500 F.2d 1401 (3d Cir. 1974); *United States v. Askins,* 351 F.Supp. 408, 415 (D.Md. 1972). That all telephone calls, including many innocent ones, are intercepted for a period of twenty days or longer does not necessarily violate the court Order, the wiretap statute, or the Fourth Amendment. *See United States v. James, supra* at 1018; *United States v. Manfredi, supra* at 599–600; *United States v. Bynum,* 485 F.2d 490, 500 (2d Cir. 1973), *vacated on other grounds,* 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974); *United States v. Cox, supra* at 1300.

■ In analyzing the totality of the circumstances surrounding the interception to determine its reasonableness and in weighing the valid law enforcement needs against the constitutional and statutory imperatives to minimize the interception of innocent conversations, courts have considered a variety of factors. Significant in this respect are the nature and scope of the alleged criminal enterprise. *See United States v. Quintana, supra* at 874; *United States v. Scott,* 516 F.2d at 758–59; *United States v. Bynum, supra* at 500–01; *United States v. Manfredi, supra* at 600. In this case, government agents were investigating what they suspected and later determined to be a large, highly sophisticated gambling operation with numerous participants. The interception, as recognized in the court Order authorizing the electronic eavesdropping, was for the purpose of ascertaining facts not about a single crime but rather for uncovering information about a broad, ongoing criminal conspiracy. Under such circumstances, considerably more latitude

may reasonably be accorded to the intercepting government agents. In language relevant to the case at bar, the Eighth Circuit in *United States v. Quintana, supra* at 874, in considering interception in the context of a narcotics conspiracy, said:

> Large and sophisticated narcotics conspiracies may justify considerably more interception than would a single criminal episode. This is especially so where, as here, the judicially approved purpose of the wiretap is not so much to incriminate the known person whose phone is tapped as to learn the identity of the far-flung conspirators and to delineate the contours of the conspiracy. *United States v. James,* 161 U.S.App.D.C. 88, 494 F.2d 1007, 1019 (1974); *United States v. Cox,* 462 F.2d 1293, 1301 (8th Cir. 1972).

*See also United States v. Armocida, supra* at 44; *United States v. Falcone, supra* at 883. In *United States v. James, supra* at 1019, the court echoed this reasoning:

> Where the criminal enterprise under investigation is a large-scale conspiracy with many participants, it may be necessary for the government to monitor more conversations with greater intensity than when the investigation is more limited. For example, some sophisticated narcotics conspiracies closely resemble advanced commercial enterprises with production and distribution networks, collection personnel, internal security forces, and so forth. Identification of the contours of the conspiracy and the participants may be the government's principal objective. *Compare United States v. Cox,* 462 F.2d 1293 (8th Cir. 1972) (continuous tap found not to violate minimization requirement where the object of the investigation was an organized criminal conspiracy of large proportions) with *United States v. King,* 335 F.Supp. 523 (S.D.Cal.1971), rev'd on other grounds, 478 F.2d 494 (9th Cir. 1973), petition for cert. filed, 42 U.S.L.W. 3018 (Mar. 29, 1973) (continuous tap found to violate the minimization requirement where the court order limited the interception to investigation of a single narcotics shipment). [Footnote omitted].

Another relevant factor is the government's reasonable expectation about the contents of the intercepted communications. In this case, it should first be recalled that electronic eavesdropping rather than a telephone tap is involved. With a telephone tap, communications are divided into discrete units which government agents can appraise individually and if believed to be innocent, can cease intercepting. They then can resume their interception activities with the activation of their equipment by the next telephone call. This segregation of communications does not exist with electronic eavesdropping. At one point in a conversation one of the conspirators may be discussing an innocent matter with a non-conspirator and shift without warning to the government agents to discussing illicit operations with a co-conspirator. In this context government agents must be given a broader scope for interception.

■ As revealed by the tapes played at trial, the electronic eavesdropping disclosed that the conversations between the conspirators in this case could shift instantaneously from innocent to criminal topics. *See United States v. Falcone, supra* at 886. Certainly the tapes disclosed no board class of innocent conversations that should not have been intercepted. *See United States v. Scott,* 516 F.2d at 758; *United States v. Bynum, supra* at 500. The agents were careful to monitor only when one of three alleged co-conspirators was present when the conversation could reasonably be believed to involve illegal gambling.[6] Additionally, this court finds relevant the cautionary language in *United States v. Cox, supra* at 1301, quoting *United States v. LaGorga,* 336 F.Supp. 190, 196 (W.D.Pa. 1971):

. . . it is often impossible to determine that a particular telephone conversation would be irrelevant and harmless until it has been terminated.

. . . . .

It is all well and good to say, after the fact, that certain conversations were irrelevant and should have been terminated. However, the monitoring agents are not gifted with prescience and cannot be expected to know in advance what direction the conversation will take. *See also United States v. Bynum, supra* at 502; *United States v. Falcone, supra* at 887. This observation is especially pertinent to this case where the subject matter of the conversations could shift rapidly and where the legality of the matter being discussed was not always readily discernible.

The degree of judicial supervision over the interception also represents an important factor in analyzing the degree of minimization accomplished. *See United States v. James, supra* at 1021; *United States v. Bynum, supra* at 501; *United States v. Armocida, supra* at 44; *United States v. Quintana, supra* at 875. In this case, Judge Young required periodic reports at five day intervals during the interception that reflected, *inter alia,* the government's minimization efforts. The fact that such reports were made periodically for review by a judge of this court is a matter to be weighed in determining whether minimization was achieved as required by both Title III and the Order of this court. *See United States v. Cox, supra* at 1301; *United States v. Focarile, supra* at 1048.

Finally, the court considers the location of the eavesdropping device relevant. While the premises at 1202 North Charles Street were used for an apparently legal bail bonding business, the tapes disclosed that they were also used frequently in furtherance of apparently lawful "sports betting" activities as well as the illegal num-

---

**6.** Defendants complain that this protection was merely self-imposed by the agents, was not contained in the court Order authorizing the interception, and therefore may not properly be considered as evidencing proper minimization. The general minimization directive was sufficient, however, since it is unrealistic to require a court to supply overly specific instructions concerning minimization in advance of the interception. *See United States v. Fino,* 478 F.2d 35, 37 (2d Cir. 1973), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974). *See generally United States v. Cirillo,* 499 F.2d 872, 879–80 (2d Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974); *United States v. Manfredi, supra* at 598.

bers operation under investigation. The contemporaneous conduct of licit and illicit gambling activities made it exceedingly difficult and at times impossible, as the tapes reveal, to determine on the spot which type of activity was being discussed. The eavesdropping device was not affixed to a private phone where, during a wiretap, it could be discerned that primarily personal matters were conducted. Rather, the device was implanted in a business office where the evidence indicates that significant gambling activities were pursued. Again, this factor suggests greater interception to have been reasonable.

 In light of the extensive nature of the criminal activities conducted at 1202 North Charles Street and the government's inability to foresee the contents of the intercepted conversations, coupled with the responsible judicial supervision, this court believes the government to have shown that degree of minimization required under the circumstances to have been achieved.[7] This court has a good recollection of the tapes played at trial. Considering their quality (often poor because they picked up virtually all sounds in the office), and that they often recorded conversations of more than two persons simultaneously, that various gambling activities were discussed in terms making it difficult to differentiate between the lawful and the unlawful, and that normal business was being conducted at the same time as illegal gambling, this court, even with the advantage of hindsight, would be at a loss to suggest how further minimization could have been achieved. Significant in this regard is the absence of any viable suggestion by the defendants as to how minimization might better have been accomplished. *See United States v. Quintana, supra* at 875; *United States v. Armocida, supra* at 45; *United States v. Manfredi, supra* at 599–600.

 Defendants also contend that the tapes should have been suppressed since

the government agents allegedly failed to record significant portions of the communications monitored in contravention of 18 U.S.C. § 2518(8)(a) (1970). That section in relevant part provides: "[t]he contents of any wire or oral communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device. . . ." As stated in footnote 4, *supra,* approximately 20% of the time monitored was recorded. Defendants assert that had all the monitored conversations been recorded, a far better record would exist with which to analyze the extent of minimization. This speculation is unavailing since the court finds that the extent of minimization is fairly established by the credible evidence. In enacting the requirement that communications should, if practicable, be recorded, Congress sought to insure that adequate records of the intercepted communications would be available. *See* 1968 *Code Cong. & Ad. News* 2112, 2193 (90th Cong., 2d Sess.).

 In *United States v. Doolittle,* 507 F.2d 1368, 1372 (5th Cir.), *aff'd per curiam,* 518 F.2d 500 (5th Cir. 1975) (en banc), *petition for cert. dismissed,* 423 U.S. 1008, 96 S.Ct. 439, 46 L.Ed.2d 380 (1975), the court addressed claims having some similarity to those presented here. In *Doolittle,* the agents, as did the agents in the present case, only recorded those intercepted conversations deemed pertinent to illegal activities. The court stated:

> The procedure testified to by the agents appears a reasonable method for complying with the order of the district court, in accord with the statutory mandate that the interception be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under Title III.

507 F.2d at 1372. *See also United States v. Bernstein,* 509 F.2d 996, 999 (4th Cir. 1975). As the court has indicated, eavesdropping is

---

**7.** It should also be noted that even had defendants succeeded in their attempt to show a failure of minimization only those nonpertinent conversations would be entitled to suppression. *See United States v. Curreri,* 363 F.Supp. 430, 437 (D.Md.), *supplemented,* 368 F.Supp. 757 (D.Md.1973), *aff'd sub nom. United States v. Bernstein,* 509 F.2d 996 (4th Cir. 1975); *United States v. Cox, supra* at 1301; *United States v. Lanza,* 349 F.Supp. 929, 932 (M.D.Fla.1972).

a breed apart from the usual telephone interception. There was no way the agents in this case could have fulfilled the mandate of the warrant without fairly continuous monitoring. Necessarily they were privy to innocent conversations. To have indiscriminately recorded all of these would have been an unwarranted invasion of the defendants' lawful activity. The course they chose was the prudent, proper and lawful one. Likewise, defendants' contention that the failure to record all the conversations monitored constitutes editing or alteration is without merit. Defendants cite no authority to support their view nor is there any indication that Congress intended the failure to record to be tantamount to editing or alteration of the tape. *See* 1968 *Code Cong. & Ad. News* 2112, 2193 (90th Cong., 2d Sess.). On the contrary, the legislative history cited suggests that the Congressional concern was to protect the physical integrity of the tapes, which protection, the evidence indicated, was properly afforded in this case. *See id.* Finally, defendants argue that the failure to record all the conversations violated their rights under *Giles v. Maryland,* 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967), and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Brady,* the Court held that it was a violation of due process for the prosecution to suppress "evidence favorable to an accused." 373 U.S. at 87, 83 S.Ct. 1194. In *Giles,* the Court remanded to the Maryland Court of Appeals since the prosecution had not disclosed evidence about the promiscuity of a rape victim and it may have allowed false evidence to go uncorrected. *See* 386 U.S. at 74, 87 S.Ct. 793. There is no indication in the present case that evidence material to defendants' guilt was withheld or that the prosecution knowingly allowed the use of false testimony.

## II

Defendants next argue that this court erred in excluding evidence relating to alleged harassment by FBI agents since that evidence attacked the credibility and motivation of the government's witnesses. Defendants especially point to the allegedly

suspect testimony of the government's expert witness, Special Agent Phillip Harker, who testified on the usual modus operandi of gambling operations. By supplemental memorandum, defendants argue that the court's failure to allow testimony and cross-examination of possible harassment and prejudice on the part of FBI agents contravened their Sixth Amendment right to confrontation. *See Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). Defendants point to the recent decision in *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), where the Court in holding that a defendant has the right to cross-examine a juvenile about his probationary status, stated:

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i. e., discredit, the witness. . . . A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony." 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970). We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. *Greene v. McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959).

415 U.S. at 316–17, 94 S.Ct. at 1110 [footnote omitted].

Having carefully reviewed defendants' contentions, the court still be-

lieves that the proffered evidence was properly excluded as irrelevant. The court recognizes that "while the scope and extent of cross examination is generally declared to be within the sound discretion of the trial court, that discretion must be exercised with due regard for the defendant's constitutional rights," in this case of confrontation and cross-examination. *See Snyder v. Coiner,* 510 F.2d 224 (4th Cir., 1975). In this case, the government's FBI witnesses testified regarding physical surveillance of the defendants and operation of the interception equipment and served only as a means of identifying for introduction into evidence the photographs and tape recordings of the defendants. Given this limited role, the witnesses' possible desire to secure a conviction represents a distracting, collateral issue legally irrelevant to the agents' testimony about production of the tapes. With respect to the expert witness, the court allowed him to be cross-examined with respect to his frequent role as a government witness and his knowledge that his findings would be used in a lottery prosecution. Restricting further inquiry with respect to the expert's possible desire for conviction was properly within this court's discretion.

### III

■■■ Defendants next challenge the propriety of the court's instructions to the jury. Defendants assert that this court, by instructing the jury that a layoff operation fell within 18 U.S.C. § 1955 (1976 Supp.) impermissibly encroached on the jury's factfinding role. The defendants suggest that the court's instruction concerning layoffs compelled the jury to believe that defendant London in fact was accepting layoffs. Guided by the Fourth Circuit's decision in *United States v. Bobo,* 477 F.2d 974, 990 (1973), this court instructed the jury that layoff operations could fall within the ambit of the statute, stating in substance:

> In determining whether the defendants were part of an illegal gambling business as charged, you may consider, among other things, whether there was an arrange-

ment or course of conduct pursuant to which some of the defendants and other persons alleged to be a part of the illegal gambling operation for their mutual advantage rebet with any other member of the gambling operation bets that they had taken from others. You will recall from the evidence that this practice is called layoff and is essential to the financial stability of such a gambling enterprise.

At no time did the court intimate that the defendants were involved in a common layoff operation. Defendants also question the court's instruction on the legality of the wiretap, suggesting that this instruction improperly bolstered the FBI agents' credibility. The instruction simply related to the legal question of the evidence's admissibility for the jury's consideration and hence was proper.

### IV

Defendants request the court to reconsider its ruling upholding the legal sufficiency of the application for the communication interception. Defendants rely on the Ninth Circuit's decision in *United States v. Kalustian,* 529 F.2d 585 (1975). After reconsidering its position, the court rejects defendants' contention for the reasons stated in this court's Memorandum and Order of October 20, 1975. *See United States v. Bobo,* supra at 983.

### V

Finally, defendants question this court's jurisdiction based on 28 U.S.C. § 545(a) (1968) which provides in pertinent part: "[e]ach United States attorney and assistant United States attorney shall reside in the district for which he is appointed . . . ." *See also* 28 U.S.C. § 515(a) (1968) (specially appointed assistant may prosecute case outside district of residence). It is undisputed that the two assistant United States attorneys who prosecuted this case reside outside the District of Maryland and they were not specially appointed to try the case.

Initially, the court notes that defendants made no objection to the prosecutors' residence before or at trial. *See Home News Publishing Co. v. United States,* 329 F.2d 191, 193 (5th Cir. 1964). More importantly, however, the ground raised by the defendant does not affect the court's jurisdiction.

In *United States v. Mitchell,* 136 F. 896 (Cr.Ct.Or.1905), the court under a predecessor statute considered the claim that the United States district attorney lived outside of the state. In rejecting any jurisdictional claim, the court stated:

> His right to the office cannot be attacked collaterally. Whether he is in fact ineligible to hold the office is not material to the purposes of this inquiry. He is a de facto officer, and is entitled to continue in the office until it is judicially declared by a competent tribunal, in a proceeding for that purpose, that he has no right to it.

136 F. at 906. *See also United States v. Denton,* 307 F.2d 336, 338–39 (6th Cir.), *cert. denied,* 371 U.S. 923, 83 S.Ct. 292, 9 L.Ed.2d 232 (1962) (unauthorized assistance from IRS lawyers does not deprive court of jurisdiction). The court construes the statutory proviso relied upon by the defendants as relating only to governmental administration and not to jurisdiction.

Accordingly, it is this 26th day of February, 1976, by the United States District Court for the District of Maryland, ORDERED that:

1. The motion for judgment of acquittal or for new trial filed by defendants London, Cottman, and Jones be, and hereby is, DENIED.

2. The motion for new trial filed by defendant Clerkly be, and hereby is, DENIED.